## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN GAETANO, BERTHA NOGAS KATHI MARTIN, and MARYANNE TAVERNE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MVHS, Inc.,<br><br>Defendant. | Case No.   6:25-cv-00118 (AJB/TWD)<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs John Gaetano, Bertha Nogas, Kathi Martin and Maryanne Taverne ("Plaintiffs"), individually and as representatives of the Class defined herein, and on behalf of the MVHS, Inc. 401(k) Plan (formerly Faxton-St. Luke's Healthcare 401(k) Plan) (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§1001-1461 ("ERISA") against Defendant MVHS, Inc. (formerly Faxton-St. Luke's Healthcare) (the "Hospital") for breaching its fiduciary duties in the management, operation and administration of the Plan. Plaintiffs bring this action to remedy this unlawful conduct, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

### INTRODUCTION

1.     The marketplace for services for defined contribution plans is established and competitive. As an ERISA fiduciary to the Plan, Defendant is obligated to act for the *exclusive* benefit of participants and beneficiaries in ensuring that Plan expenses are reasonable. 29 U.S.C. § 1104(a)(1). These duties are the "highest known to the law," which must be performed with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982); *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2001).

In discharging these duties, ERISA fiduciaries are held to the standard of financial experts in the field of investment management. *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 388 (6th Cir. 2015); see also *Katsaros v. Cody*, 744 F.2d 270, 275, 279 (2d Cir. 1984); *Liss v. Smith*, 991 F. Supp. 278, 296 (S.D.N.Y. 1998). The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting investments as well as a continuing duty to monitor fees and expenses of selected investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 - 1829 (2015); 29 U.S.C. § 1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.").

2.      In this case, Defendant failed to meet its fiduciary obligations in basic ways. <u>*First*</u>, the Plan offered and maintained higher cost share classes when identical lower cost share classes of the same mutual funds were available. This resulted in the participants paying additional unnecessary operating expenses with no value to the participants and resulting in a loss of compounded returns. This is one of the most common and well-known examples of an imprudent investment decision.[1] An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). To do this prudently, a fiduciary must have a viable

---

[1]      The need to monitor share classes is so basic that the U.S. Security and Exchange Commission ("SEC") routinely audits SEC registered investment advisors to make sure that advisors take full advantage of all share class discounts available to their clients. *See* SEC Office of Compliance Inspections and Examinations ("OCIE"), "National Exam Program, Risk Alert," (July 13, 2016) ("OCIE Share Class Initiative"), available at https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf ; *See also* FINRA 2016 Regulatory and Examination Priorities Letter, available at https://www.finra.org/sites/default/files/2016-regulatory-and-examination-priorities-letter.pdf.

methodology for selecting and monitoring mutual fund share classes. For a large plan of approximately $200 million in net assets, such as this Plan, a fiduciary using a viable methodology will monitor the Plan's investment options continuously to immediately take advantage of share class discounts as they become available. Information regarding share class discounts is made available to the public as part of the online EDGAR database maintained by the SEC. Defendant however failed to monitor the share classes of mutual fund investments and to substitute less expensive share classes of mutual funds for more expensive share classes of the very same mutual fund, thus wasting the assets of the Plan participants. This could have been easily remedied only if Defendant had a viable review process and methodology, which it neglected to keep and implement, violating its fiduciary duties.

3.      _Second_, Defendant failed to monitor the Plan's fees and expenses. As a result, the Plan kicked back payments to recordkeepers and other non-parties from the retirement savings of the Hospital's employees in excessive amounts.

4.      _Third,_ Defendant breached its fiduciary duties by choosing to utilize forfeited funds in the Plan for its benefit rather than in the interest of the participants and beneficiaries. When presented with this conflict of interest between deciding to use forfeited amounts to reduce the Plan's administrative expenses or reduce employer contributions, Defendant chose the latter, despite being a fiduciary to the Plan with an obligation to act "solely in the interest of the participants and beneficiaries".

5.      Pertinently, Plaintiffs are not merely second-guessing Defendant's investment decisions with the benefit of hindsight. The information Defendant needed, to make informed and prudent decisions, was readily available when the decisions were made. Defendant however failed to make prudent decisions and breached its fiduciary obligations. Plaintiffs, individually and as

representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendant's liability under 29 U. S. C. §1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, violation of ERISA's anti-inurement provision and engaging in self-dealing and transactions prohibited by ERISA. Plaintiffs also seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

7.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

8.      This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. §1391(b) because it is the district and division in which the subject Plan is administered, where at least one of the alleged breaches took place, and where the Defendant is located.

## PARTIES

### Plaintiffs

9.      Plaintiff John Gaetano was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period[2] because he and his beneficiaries were eligible

---

[2]      Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation . . .

to receive benefits under the Plan. During the Class Period, Plaintiff Gaetano invested in the challenged funds, the Harbor Capital Appreciation Fund and the John Hancock Disciplined Value Mid Cap Fund. Plaintiff Gaetano was also harmed by the Plan's excessive administrative fees. As a result, Plaintiff Gaetano has been financially harmed by Defendant's unlawful conduct. This information is known to Defendant as Defendant has control and possession of all Plan participants' records. Plaintiff Gaetano's account would have been worth more had Defendant not violated ERISA as described herein. Plaintiff Gaetano became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

10.     Plaintiff Bertha Nogas was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan. During the Class Period, Plaintiff Nogas invested in the challenged funds, the Harbor Capital Appreciation Fund and the John Hancock Disciplined Value Mid Cap Fund. Plaintiff Nogas was also harmed by the Plan's excessive administrative fees. As a result, Plaintiff Nogas has been financially harmed by Defendant's unlawful conduct. This information is known to Defendant as Defendant has control and possession of all Plan participants' records. Plaintiff Nogas's account would have been worth more had Defendant not violated ERISA as described herein. Plaintiff Nogas became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

11.     Plaintiff Kathi Martin was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible

---

." 29 U.S.C. § 1113. *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015) ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely."). Accordingly, here, the Class Period begins six years before the date of the filing of this Complaint.

to receive benefits under the Plan. As a result of Defendant's unlawful conduct, Plaintiff Martin has been financially harmed by Defendant's unlawful conduct. This information is known to Defendant as Defendant has control and possession of all Plan participants' records. Plaintiff Martin became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

12.    Plaintiff Maryanne Taverne was an employee at the Hospital and a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan. As a result of Defendant's unlawful conduct, Plaintiff Taverne has been financially harmed by Defendant's unlawful conduct. This information is known to Defendant as Defendant has control and possession of all Plan participants' records. Plaintiff Taverne became aware of the alleged breaches only shortly prior to filing the initial Complaint in this action.

**The Plan**

13.    The Plan was established effective July 1, 1989. The Plan is a defined contribution plan, within the meaning of 29 U.S.C. § 1002(34). As of December 31, 2023, the Plan had 4486 participants with account balances and $204,242,546 in net assets.

**Defendant**

14.    Defendant Hospital maintains its places of business at 1656 Champlin Avenue, Utica, NY 13502 and 111 Hospital Drive, Utica, NY 13502. The Plan's disclosures and form 5500s filed during the Class Period identify the Hospital as the Plan's sponsor and Administrator.

15.    Thus, the Hospital is a fiduciary to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because it has the sole authority to amend or terminate, in whole or part, the Plan, and has discretionary authority to control the operation, management and administration of the Plan,

including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available.

16.     Though not named as Defendants, certain service providers are fiduciaries to the Plan participants and are parties in interest in the matter. Lincoln National Corporation serves as custodian and recordkeeper to the Plan and is a "party-in-interest" to the Plan. TruePlan Benefit and Retirement Advisors (formerly known as HANYS Benefit Services) is also a "party in interest" to the Plan.

## **DEFENDANT'S FIDUCIARY OBLIGATIONS**

17.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as a Plan fiduciary. The duties owed by an ERISA fiduciary to plan participants are the "highest known to the law." *See Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (citing Restatement (Second) of Trusts § 2 cmt. b (1959)). 29 U.S.C. §1104(a) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

18.     29 U.S.C. § 1104(a)(1)(C) further provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." Further, a fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

19.     29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable

compensation is paid therefor." Lincoln is a "parties in interest" under 29 U.S.C. §1106(a)(1)(C)

and 29 USC § 1002(14).

20.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C.

§ 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by

another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant

part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

21.    29 U.S.C. § 1132(a)(2) and common law authorizes a plan participant to bring a

civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section

1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

22.    Plaintiffs have relied upon publicly available information and limited documents

provided by the Defendant, including quarterly statements provided to the Plaintiffs, the Plan's

404a-5 participant disclosures, the Plan's Annual Form 5500 Reports filed during the Class Period (which are "Open to Public Inspection" and available for download from https://www.efast.dol.gov/5500Search/), other publicly available Form 5500 Reports, and mutual fund prospectuses available on SEC's EDGAR database.

## **FACTUAL ALLEGATIONS**

23.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts. Individual account value is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less fees and expenses. *See* 29 U.S.C. § 1002(34).

**A.     Defendant Caused Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Share Classes as Plan Investment Options**

24.     A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds and each share represents an investor's part ownership in the fund and the income it generates. Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

25.     Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (i.e. sales) charges. Each class represents an identical interest in the mutual fund's portfolio. All share classes of mutual funds charge fees for the management of the assets of the fund. The cost may differ, but the investment product is identical - the managers, investment styles, and stocks are not merely similar,

but identical. The principal difference between the classes is that the mutual fund will charge different marketing, distribution and service expenses depending on the class chosen. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan since institutional investors make large fund share purchases, and higher-class shares are typically retail class shares which are available to a broader spectrum of investors. The Department of Labor has stated that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics. One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., *Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

26.    Defendant had access to these low-cost institutional share classes of mutual funds, as it could easily meet the minimum investment requirements. Instead of monitoring and taking advantage of volume discounts in purchasing mutual fund shares, Defendant instead offered higher cost mutual fund share classes as investment options for the Plan. Thus, the Plan fiduciary wasted the assets of the Plan by failing to monitor the available share classes and to select the lowest share class of the funds for inclusion in the plan menu. This failure continued from the beginning of the class period until at least 2023 (the latest year for which details of investment options are currently available to Plaintiffs).

27.    The following are instances in which the Defendant wasted money by failing to select the lowest-cost share class of the mutual fund as an investment option for the Plan:

28.    Defendant chose Harbor Capital Appreciation Fund as an investment option available to participants. Defendant chose to invest in the "Institutional" share class in 2019. As per the Plan's 404a-5 disclosures, as of December 31, 2019, the Plan's chosen "Institutional" share

class had a net expense ratio of 0.66% for the year ending 2019. During the same year, other shares classes such as the "Retirement" class had a net expense ratio of 0.58% (as of March 1, 2019).[3] This option was available to the Defendant and easily identifiable, as it was disclosed in the Harbor Capital Appreciation Fund's summary prospectus and the Plan met all criteria and investment minimums. Defendant however continued to keep the Plan's investments in the "Institutional" share class which had a higher expense ratio until 2024, incurring a net expense ratio of 0.67% for the years 2020 and 2021, 0.65% for 2022 and 0.67% for 2023. During this same time, the "Retirement" share class had a net expense ratio of 0.59% for 2020-2021,[4] 0.57% for 2022 (as of March 1, 2022),[5] and 0.59% for 2023 (as of March 1, 2023).[6] From the information available in the fund's publicly available prospectus, Defendant should have known of this option. Defendant, however, failed to fulfill its duties and kept the Plan's investments in share classes which had a higher cost to the Plan participants.

29.    Defendant chose John Hancock Disciplined Value Mid Cap as an investment option available to participants. Defendant chose to invest in share class "I" in 2019. As per the Plan's

---

[3]    *See* Form 497K, Harbor Capital Appreciation Fund, Summary Prospectus (March 1, 2019),
https://www.sec.gov/Archives/edgar/data/793769/000119312519058091/d686010d497k.htm.

[4]    *See* Form 497K, Harbor Capital Appreciation Fund, Summary Prospectus (March 1, 2020),
https://www.sec.gov/Archives/edgar/data/793769/000119312520056510/d864555d497k.htm;
Form 497K, Harbor Capital Appreciation Fund, Summary Prospectus (March 1, 2021),
https://www.sec.gov/Archives/edgar/data/793769/000119312521054372/d108409d497k.htm.

[5]    *See* Form 497K, Harbor Capital Appreciation Fund, Summary Prospectus (March 1, 2022),
https://www.sec.gov/Archives/edgar/data/793769/000119312522061135/d276590d497k.htm.

[6]    *See* Form 497K, Harbor Capital Appreciation Fund, Summary Prospectus (March 1, 2023),
https://www.sec.gov/Archives/edgar/data/793769/000119312523054036/d401693d497k.htm.

404a-5 disclosures, as of December 31, 2019, the Plan's chosen share class "I" had a net expense

ratio of 0.86% for the year ending 2019. During the same year, other shares classes such as share

class "R6" had a net expense ratio of 0.76% (as of August 1, 2019).[7] This option was available to

the Defendant and easily identifiable, as it was disclosed in the John Hancock Disciplined Value

Mid Cap Fund's summary prospectus and the Plan met all criteria and investment minimums.

Defendant however continued to keep the Plan's investments in share class "I" which had a higher

expense ratio until 2024, incurring a net expense ratio of 0.86% for the years 2020-2022 and 0.85%

for the year 2023. During this same time, share class "R6" had a net expense ratio of 0.75% for

2020-2023.[8] From the information available in the fund's publicly available prospectus, Defendant

should have known of this option. Defendant, however, failed to fulfill its duties and kept the

Plan's investments in share classes which had a higher cost to the Plan participants.

30.    Separately, for the years 2019 and 2020, Defendant failed to offer collective trust

versions of the T. Rowe Price Target Date Mutual Funds in the Plan costing Plan participants more

fees for the same product. Like mutual funds, collective trusts pool plan participants' investments,

---

[7]    *See* Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus
(August 1, 2019)
https://www.sec.gov/Archives/edgar/data/1329954/000113322819004941/jhfiii-
html1474_497k.htm.

[8]    *See* Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary Prospectus
(August 1, 2020)
https://www.sec.gov/Archives/edgar/data/1329954/000113322820004784/jhfiiidvmcf-
html2835_497k.htm; Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary
Prospectus (August 1, 2021)
https://www.sec.gov/Archives/edgar/data/1329954/000113322821004156/jhfiiidvmcf-
html3889_497k.htm; Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary
Prospectus (August 1, 2022)
https://www.sec.gov/Archives/edgar/data/1329954/000113322822005192/jhdvmcf-
html5285_497k.htm; Form 497K, John Hancock Disciplined Value Mid Cap Fund, Summary
Prospectus (August 1, 2023)
https://www.sec.gov/Archives/edgar/data/1329954/000119311252519951/d519336d497k.htm.

but can provide an even lower fee alternative compared to I-share classes of mutual funds. Collective trusts are administered by banks or trust companies, regulated by the Office of the Comptroller of the Currency, rather than the Securities and Exchange Commission, and have simple disclosure requirements and cannot advertise or issue formal prospectuses. Collective trusts thus have much lower costs than mutual funds, with less or no administrative costs and less or no marketing or advertising costs. Collective trusts have been used by retirement plans for decades and contract directly with 401(k) plans and provide regular reports regarding costs and investment holdings.

31.    The T. Rowe Price Retirement Trusts collective trust has the same portfolio management team, investment strategy, subasset-class exposure, tactical allocation overlay and underlying investments as the mutual fund-based T. Rowe Price Retirement Funds target-date series. However, the Plan's menu of investments needlessly consisted of the expensive mutual fund versions that ranged between 0.53% to 0.72% for 2019 and 0.52% to 0.71% for 2020 instead of the collective trust versions that had a cheaper expense ratio of 0.43% for 2019 and 2020.

32.    Similarly, Defendant failed to monitor the Plan's stable value fund options. During the Class Period, the Plan's stable value options provided a low rate of return of 3% or lower for the entirety of the Class Period. Substantially similar products were available in the market that offered a better return, such as other stable value products offered by Lincoln, the Plan's provider, which provided a return of 4.10% in 2023. According to publicly available information, Lincoln's major competitor TIAA had crediting rates of at least 4.25%—and often even higher—throughout the Class Period: for instance, TIAA-Cref Retirement Choice had a crediting rate that ranged between 4.25% to 6.33% through the Class Period. There is a crucial distinction in evaluating a stable value product's return against investment returns available elsewhere, from the standpoint

of how a fiduciary's choice is to be evaluated. The product's performance over the life of the product is guaranteed for a period at the outset. The plan fiduciary knows prior to the date the product is selected what the returns will be three months in advance. A stable value product is less sensitive to changes in interest rates than conventional bond funds. Stable value funds are just that: stable. A stable value product that performs well generally continues to perform well, in a stable manner. Stable value products that perform poorly, such as the funds selected by Defendant, generally continue to perform poorly, also in a stable manner.

33.    The Plan fiduciary had a duty to monitor the excessive costs that were being accrued by the Plan. Simply put, given the choice of two identical investments – with the same assets, investment style, and management – Defendant chose the more expensive product. Defendant thus caused Plan participants/beneficiaries harm by forcing them to pay higher fees and causing lost yield and returns they rely on for retirement income. In doing so, Defendant undermined the very purpose of the Plan: to provide income security for participants/beneficiaries.

**B.    Defendant Wasted Participants' Money Because It Failed to Appropriately Monitor the Plan's Excessive Fees**

34.    Defendant has a duty to prudently select covered service providers. Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation. Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[9] The DOL has observed that:

> …the responsible plan fiduciary must engage in an objective process designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of

---

[9]    DOL Info. Letter to Theodore Konshak (Dec. 1, 1997), available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/12-01-1997.

the services provided. In addition, such process should be designed to avoid self-dealing, conflicts of interest or other improper influence….

Soliciting bids among service providers at the outset is a means by which the fiduciary can obtain the necessary information relevant to the decision-making process. Whether such a process is appropriate in subsequent years may depend, among other things, upon the fiduciary's knowledge of a service provider's work product, the cost and quality of services previously provided by the service provider, the fiduciary's knowledge of prevailing rates for the services, as well as the cost to the plan of conducting a particular selection process. Regardless of the method used, however, the fiduciary must be able to demonstrate compliance with ERISA's fiduciary standards.

35.    Administrative services are a necessary service for every defined contribution plan. The market for recordkeeping and administrative services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high level of service to a large defined contribution plan like the Plan and will readily respond to a request for proposal. These service providers primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

36.    Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. There are two types of essential recordkeeping services provided by all national recordkeepers for plans with significant bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet style level of service, meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis. These services include, but are not limited to, the following:

- Basic account recordkeeping (e.g. investment and vesting records);

- Transaction processing;

- Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, e.g., summary plan descriptions);

- Maintenance of an employer stock fund (if needed);

- Plan document services, including updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

- Plan consulting services, including assistance in selecting the investment lineup offered to participants;

- Accounting and audit services, including the preparation of annual reports, e.g., Form 5500s[10];

- Compliance support, including assistance interpreting plan provisions and ensuring plan operation complies with legal requirements and plan provisions (excluding separate legal services provided by a third-party law firm); and

- Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

37.    These services are offered by all recordkeepers for one price (typically at a per capita rate), regardless of the services chosen or utilized by a plan. Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts

---

[10]    In terms of service codes listed on a Form 5500, there is virtually no uniformity in the manner that Form 5500s are completed; there are multiple ways to complete a Form 5500 with respect to the same services performed for a retirement plan receiving the same services and there is essentially no penalty associated with inaccurately completing a Form 5500. As a result, any person that compares the service codes on a Form 5500 in an effort to determine whether the same or similar services are being provided to a given retirement plan belies a fundamental misunderstanding of how Form 5500s work, how they are completed, and what they actually reflect and show. Thus, the Court should eschew any analysis on the basis of service codes in a Form 5500 since any such analysis only amounts to an effort to mislead and an invitation to err.

understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services; any claim that recordkeeping expenses depend upon the service level provided to a plan is both false and frivolous. Nonetheless, fiduciary-defendants all too often attempt to stave off breach of fiduciary duty claims by disingenuously asserting that the cost of such services depends upon service level, even though such an assertion is plainly untrue based upon the actual marketplace for such services.

38.     The second type of essential administrative services provided by all national recordkeepers, often have separate, additional fees based on the conduct and use of individual participants. These fees are distinct from the above arrangement and ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These typically include, but are not limited to, the following: loan processing; brokerage services/account maintenance (if offered by the plan); distribution services; and processing of qualified domestic relations orders.

39.     All national recordkeepers have the capability to provide all of the aforementioned services to large defined contribution plans, including those smaller than the Plan. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all offer the same bundles and combinations of services. Accordingly, as noted above, the market for defined contribution plan recordkeeping and administrative services has become increasingly price competitive.

40.     The cost of administrative services typically depends on the number of participants, not on the amount of assets in the participant's retirement account. Thus, the cost of providing administrative services to a participant with a $100,000 account balance is the same for a participant with a $1,000 account balance. Plans with large numbers of participants can take

advantage of economies of scale: a plan with 15,000 participants can negotiate a much lower per participant fee for administrative services than a plan with 1,000 participants.

41.     When selecting a service provider or a recordkeeper, a fiduciary of a large plan like the Plan at issue, must solicit competitive bid proposals from several recordkeepers. The plan fiduciary should require the recordkeeper to identify, not only the administrative services and their cost, but also the cost of proprietary products – that is, investments offered by the recordkeeper or its affiliates – that the Plan must select.

42.     To monitor administrative costs, a prudent fiduciary must engage in a process called "benchmarking" to verify that the recordkeeper selected charges no more than reasonable fees. This involves, at the very least, comparing the cost of the proposed recordkeeper against the costs of the leading providers in the industry. Benchmarking is necessary both at the time a recordkeeper is selected, to verify the initial fees are reasonable, and at regular intervals thereafter. In evaluating the compensation of a recordkeeper, a plan fiduciary must consider the compensation of the recordkeeper from all sources, whether from direct payments, income from stable value funds, fees from separate accounts, revenue share from mutual funds, among other sources. To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, a prudent fiduciary of a large defined contribution plan must also engage in a process of putting the plan's recordkeeping and administrative services out for competitive bidding at regular intervals of approximately three years and monitor administrative costs regularly within that period.

43.     In this case, based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by Lincoln, the Plan's 2810 to 4486 participants during the Class Period, and the market, the outside limit of a reasonable

administrative fee for the Plan should have been no more than $70 per participant for the Class Period.[11] Here, Plan participants were paying excess fees in the range of $92 - $267. A summary of total losses suffered by the Plan participants is provided below:

| Year | Average Administrative/ Recordkeeping expenses paid by the Plan per Plan participant (in USD) | Total Administrative expenses paid by the Plan | No. of Plan Participants with account balances | Administrative expenses at $70 per Plan Participant | Loss suffered by the Plan |
|---|---|---|---|---|---|
| 2023 | 92.67 | 415,733 | 4486 | 314,020 | 101,713 |
| 2022 | 193.50 | 536,973 | 2775 | 194,250 | 342,723 |
| 2021 | 267.93 | 720,478 | 2689 | 188,230 | 532,248 |
| 2020 | 181.07 | 492,352 | 2719 | 190,330 | 302,022 |
| 2019 | 183.46 | 515,527 | 2810 | 196,700 | 318,827 |
| Total losses suffered by the Plan | | | | | $1,597,533 |

44.     During the class period, the average recordkeeping/administrative fees paid was substantially higher than the average paid by other substantially similar plans, which is clear and

[11]     *See*, 17th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2022 (March 2023), available at https://www.nepc.com/wp-content/uploads/2023/03/2022-NEPC-DC-Plan-Trends-Fees-Survey-Results_Final.pdf; *See also* 16th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2021 (February 2022), available at https://www.nepc.com/wp-content/uploads/2022/02/2021-NEPC-DC-Plan-Trends-and-Fee-Survey-Full-Results.pdf; 15th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2020, available at NEPC-Horizontal-InvestorForce-Compatible.pptx (hubspotusercontent00.net); 14th Annual NEPC Defined Contribution Plan Trends and Fees Survey for the year 2029, available at https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

compelling circumstantial evidence that the reasonable market rate was lower than what the Plan was paying since these comparable plans were able to negotiate lower fees for materially identical services. The tables below list the recordkeeping fees paid by similarly sized defined contribution plans to several different high-quality, national recordkeepers providing materially identical services, which represent the prices available to the Plan during the Class Period. The tables[12] also indicate the number of participants and assets of each plan.

**2019**

| Plan | Participants with account balances at the end of 2019 | Total Number of Assets at the end of 2019 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|------|------|------|------|------|------|
| Docusign, Inc. 401(k) Plan | 2,630 | 120,062,282 | 24,522 | The Vanguard Group, Inc. | 9 |
| Related Partners, Inc. Retirement Savings Plan | 5481 | 239,756,344 | 62,587 | Merrill Lynch, Pierce, Fenner and Smith, Inc. | 11 |
| Oppenheimer & Co. Inc. 401(K) Plan | 3,529 | 456,441,313 | 66,987 | John Hancock Retirement Plan Services | 19 |

---

[12]    Calculations are based on Form 5500 information filed by the respective plans for each fiscal from 2019-2023. Recordkeeping/administrative costs in the chart are mainly derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. See Instructions for Form 5500 (2019) at pg. 27 (defining each service code), available at https://www. dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting and-filing/form-5500/2019-instructions.pdf. For some plans, recordkeeping fees are expressly noted in the Form 5500s, and figures have been taken from those statements.

| Plan | Participants with account balances at the end of 2019 | Total Number of Assets at the end of 2019 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|------|------|------|------|------|------|
| Toll Brothers 401k Savings Plan | 5,524 | 445,825,604 | 137,628 | Prudential Retirement | 25 |
| West Pharmaceutical Services, Inc. 401(K) Plan | 3,649 | 325,708,872 | 130,246 | The Vanguard Group, Inc. | 36 |
| Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 3,999 | 541,222,164 | 180,715 | The Vanguard Group, Inc. | 45 |
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,215 | 587,410,642 | 283,441 | Great-West Life & Annuity Insurance | 46 |
| HealthFirst Profit Sharing 401(k) | 5,499 | 310,744,850 | 283,255 | The Vanguard Group, Inc. | 52 |
| PBF Energy Retirement Savings Plan | 3,900 | 504,244,997 | 205,577 | The Vanguard Group, Inc. | 53 |
| Arthrex 401(K) Retirement Savings Plan | 3,567 | 240,022,209 | 205,478 | Prudential retirement | 58 |

| Plan | Participants with account balances at the end of 2019 | Total Number of Assets at the end of 2019 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|------|------|------|------|------|------|
| Amica 401(K) Retirement Savings Plan | 5338 | 699.843.742 | 350,029 | The Vanguard Group, Inc. | 66 |

**2020**

| Plan | Participants with account balances at the end of 2020 | Total Number of Assets at the end of 2020 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|------|------|------|------|------|------|
| Related Partners, Inc. Retirement Savings Plan | 5,318 | 279,554,526 | 50,557 | Merrill Lynch Pierce, Fenner, and Smith | 10 |
| Oppenheimer & Co. Inc. 401(K) Plan | 3,514 | 541,895,916 | 65,885 | John Hancock Retirement Plan Services | 19 |
| Toll Brothers 401k Savings Plan | 4,981 | 521,202,812 | 125,580 | Prudential Retirement | 25 |
| West Pharmaceutical Services, Inc. 401(K) Plan | 4,483 | 418,790,246 | 140,008 | The Vanguard Group, Inc. | 31 |
| Docusign, Inc. 401(k) Plan | 3,749 | 212,160,917 | 155,892 | The Vanguard Group, Inc. | 42 |

| Plan | Participants with account balances at the end of 2020 | Total Number of Assets at the end of 2020 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|---|---|---|---|---|---|
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,266 | 644,466,966 | 295,016 | Great-West Life & Annuity Insurance | 47 |
| Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 4,083 | 619,073,281 | 202,010 | The Vanguard Group, Inc. | 50 |
| Arthrex 401(K) Retirement Savings Plan | 4,027 | 303,878,041 | 216,954 | Prudential Retirement | 54 |
| PBF Energy Retirement Savings Plan | 4,853 | 629,583,006 | 268,912 | The Vanguard Group, Inc. | 55 |
| HealthFirst Profit Sharing 401(k) | 5,776 | 391,756,016 | 322,498 | The Vanguard Group, Inc. | 56 |
| Amica 401(K) Retirement Savings Plan | 5,247 | 797,670,577 | 371,868 | The Vanguard Group, Inc. | 71 |

**2021**

| Plan | Participants with account balances at the end of 2021 | Total Number of Assets at the end of 2021 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|---|---|---|---|---|---|
| Related Partners, Inc. Retirement Savings Plan | 5,594 | 322,946,902 | 46,136 | Merrill Lynch Pierce, Fenner, and Smith | 8 |
| Amica 401(K) Retirement Savings Plan | 5,168 | 910,498,456 | 57,100 | The Vanguard Group, Inc. | 10 |
| PBF Energy Retirement Savings Plan | 4,161 | 729,275,768 | 60,624 | The Vanguard Group, Inc. | 15 |
| Oppenheimer & Co. Inc. 401(K) Plan | 3,549 | 624,604,097 | 59,329 | John Hancock Retirement Plan Services | 17 |
| Toll Brothers 401k Savings Plan | 5,711 | 616,186,907 | 124,296 | Prudential Retirement | 22 |
| West Pharmaceutical Services, Inc. 401(K) Plan | 4,959 | 514,861,682 | 184,439 | The Vanguard Group, Inc. | 37 |
| HealthFirst Profit Sharing 401(k) | 6,140 | 478,613,172 | 244,395 | The Vanguard Group, Inc. | 40 |
| Docusign, Inc. 401(k) Plan | 5,209 | 331,790,466 | 230,120 | The Vanguard Group, Inc. | 44 |

| Plan | Participants with account balances at the end of 2021 | Total Number of Assets at the end of 2021 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|------|------|------|------|------|------|
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,124 | 696,539,380 | 279,354 | Great-West Life & Annuity Insurance | 46 |
| Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 4,368 | 704,561,206 | 215,767 | The Vanguard Group, Inc. | 49 |
| Arthrex 401(K) Retirement Savings Plan | 4,302 | 366,622,183 | 244,336 | Prudential Retirement | 57 |

**2022**

| Plan | Participants with account balances at the end of 2022 | Total Number of Assets at the end of 2022 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|------|------|------|------|------|------|
| Amica 401(K) Retirement Savings Plan | 5,311 | 752,863,878 | 53,980 | The Vanguard Group, Inc. | 10 |
| Oppenheimer & Co. Inc. 401(K) Plan | 3,601 | 516,771,931 | 72,769 | John Hancock Retirement Plan Services | 20 |

| Plan | Participants with account balances at the end of 2022 | Total Number of Assets at the end of 2022 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|---|---|---|---|---|---|
| PBF Energy Retirement Savings Plan | 4,750 | 668,4646,399 | 96,066 | The Vanguard Group, Inc. | 20 |
| Toll Brothers 401k Savings Plan | 6,216 | 509,934,769 | 136,768 | Prudential Retirement | 22 |
| Related Partners, Inc. Retirement Savings Plan | 6,064 | 280,662,058 | 150,620 | Merrill Lynch Pierce, Fenner, and Smith | 25 |
| Docusign, Inc. 401(k) Plan | 6,089 | 341,944,424 | 154,864 | The Vanguard Group, Inc. | 25 |
| West Pharmaceutical Services, Inc. 401(K) Plan | 5,458 | 412,346,793 | 220,917 | The Vanguard Group, Inc. | 40 |
| HealthFirst Profit Sharing 401(k) | 6,879 | 433,182,155 | 302,849 | The Vanguard Group, Inc. | 44 |
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,382 | 609,602,621 | 283,184 | Empower Annuity Insurance Co. | 44 |

| Plan | Participants with account balances at the end of 2022 | Total Number of Assets at the end of 2022 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|------|------|------|------|------|------|
| Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 4,681 | 606,255,279 | 236,121 | The Vanguard Group, Inc. | 50 |
| Arthrex 401(K) Retirement Savings Plan | 4,832 | 339,508,247 | 251,029 | Prudential Retirement | 52 |

**2023**

| Plan | Participants with account balances at the end of 2023 | Total Number of Assets at the end of 2023 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|------|------|------|------|------|------|
| Amica 401(K) Retirement Savings Plan | 5,401 | 877,095,933 | 56,794 | The Vanguard Group, Inc. | 11 |
| PBF Energy Retirement Savings Plan | 4,780 | 853,796,321 | 69,240 | The Vanguard Group, Inc. | 14 |
| Oppenheimer & Co. Inc. 401(K) Plan | 3,657 | 603,016,042 | 96,421 | John Hancock Retirement Plan Services | 26 |
| Toll Brothers 401k Savings Plan | 6,204 | 627,496,919 | 161,965 | Prudential Retirement | 26 |

| Plan | Participants with account balances at the end of 2023 | Total Number of Assets at the end of 2023 (in USD) | Administrative/ Recordkeeping expenses (in USD) | Record-keeper | Avg. cost |
|---|---|---|---|---|---|
| Related Partners, Inc. Retirement Savings Plan | 5,888 | 349,425,456 | 156,876 | Merrill Lynch Pierce, Fenner, and Smith | 27 |
| Docusign, Inc. 401(k) Plan | 6,004 | 481,119,275 | 169,048 | The Vanguard Group, Inc. | 28 |
| West Pharmaceutical Services, Inc. 401(K) Plan | 5,399 | 470,946,877 | 176,779 | Fidelity | 33 |
| Arthrex 401(K) Retirement Savings Plan | 5,885 | 436,833,228 | 260,706 | Empower Annuity Insurance Co. | 44 |
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,231 | 693,868,983 | 288,004 | Empower Annuity Insurance Co. | 46 |
| Mettler-Toledo, LLC Enhanced Retirement Savings Plan | 4,652 | 709,412,056 | 240,536 | The Vanguard Group, Inc. | 52 |
| HealthFirst Profit Sharing 401(k) | 7,024 | 554,346,939 | 369,588 | The Vanguard Group, Inc. | 53 |

45. Defendant should have been aware of this potential for abuse and monitored for it. It failed to do that, and the participants suffered for it. Every dollar of unreasonable administrative fees cost participants a retirement dollar that was no longer available for investment.

**C.    Defendant Failed to Utilize Forfeited Amounts for the Plan's Benefit**

46. In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund. The Plan is funded by a combination of wage withholdings by Plan participants and employer matching contributions, both of which are deposited into the Plan's trust fund. For each year of the Class Period, the Hospital made 50%-100% matching contributions for each participant who completed at least one year of service and was aged 21 or older, up to 1%-4% of eligible compensation based on years of service. Participants in the Plan are immediately vested in their own contributions, along with any income or losses on those balances. The Hospital's matching contributions, plus any income or losses on those balances, become vested over a period of years depending on when the participant was hired.

47. When a participant has a break in service prior to full vesting of the matching contributions, the participant forfeits the balance of unvested matching contributions in his or her individual account and Defendant exercises discretionary authority and control over how these Plan assets are thereafter reallocated. The Plan provides that forfeited nonvested accounts may be used to pay Plan administrative expenses or reduce future matching contributions. Although the Plan expressly authorizes the use of forfeited funds to pay Plan expenses, throughout the Class Period Defendant made the choice to utilize the forfeited funds in the Plan for the Hospital's own benefit, to the detriment of the Plan and its participants, by reallocating nearly all of these Plan assets to reduce future matching contributions to the Plan.

48. In 2019, Hospital matching contributions to the Plan were reduced by $215,000 as a result of Defendant's reallocation of forfeited nonvested funds for the Hospital's own benefit,

leaving a balance of approximately $122,000 in the forfeiture account, none of which was used to pay any part of the $515,527 in Plan expenses.

49.     In 2020, Hospital matching contributions to the Plan were reduced by $225,000 as a result of Defendant's reallocation of forfeited nonvested funds for the Hospital's own benefit, leaving a balance of approximately $215,000 in the forfeiture account, none of which was used to pay any part of the $492,352 in Plan expenses.

50.     In 2021, Hospital matching contributions to the Plan were reduced by $189,000 as a result of Defendant's reallocation of forfeited nonvested funds for the Hospital's own benefit, leaving a balance of approximately $225,000 in the forfeiture account, none of which was used to pay any part of the $720,478 in Plan expenses.

51.     In 2022, Hospital matching contributions to the Plan were reduced by $274,000 as a result of Defendant's reallocation of forfeited nonvested funds for the Hospital's own benefit, leaving a balance of approximately $189,000 in the forfeiture account, none of which was used to pay any part of the $536,973 in Plan expenses.

52.     In 2023, Hospital matching contributions to the Plan were reduced by approx. $389,000 as a result of Defendant's reallocation of forfeited nonvested funds for the Hospital's own benefit, leaving a balance of approximately $174,000 in the forfeiture account, none of which was used to pay any part of the $415,733 in Plan expenses.

53.     When a participant has a break in service prior to full vesting of the matching contributions, the participant forfeits the balance of unvested matching contributions in his or her individual account and Defendant exercises discretionary authority and control over how these Plan assets are thereafter reallocated. The Plan provides that forfeited nonvested accounts may be used to pay Plan administrative expenses or reduce future matching contributions. Although the

Plan expressly authorizes the use of forfeited funds to pay Plan expenses, throughout the Class Period Defendant made the choice to utilize the forfeited funds in the Plan for the Hospital's own benefit, to the detriment of the Plan and its participants, by reallocating nearly all of these Plan assets to reduce future matching contributions to the Plan.

54.    As stated in the Plan's annual Form 5500 Reports filed during the Class Period, the Plan provides that "forfeited" amounts "may be used" to "pay Plan administrative expenses, reduce Employer contributions or allocated to each participant's account based upon the relation of the participant's compensation to total compensation for the Plan year." Using forfeitures to reduce employer contributions is always in the best interest of the Defendant because that option would reduce its own costs. This could possibly benefit participants when Defendant may be financially unable to satisfy its matching contribution obligations. However, using forfeitures to pay Plan expenses would be in the participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such expenses. In making these decisions, Defendant is presented with a conflict of interest that pits its interests over the participants' interests. Defendant, in breach of its fiduciary obligations, failed to undertake any investigation into which option was in the best interest of the Plan's participants and beneficiaries and chose its own interests.

55.    Although ERISA requires Defendants to defray the Plan's expenses, see 29 U.S.C. § 1104(a)(1)(A)(ii), and although the Plan permits Defendant to use the forfeited funds to pay Plan expenses, throughout the Class Period Defendant declined to use any forfeited funds for that purpose. Instead, Defendant chose to use the forfeitures for their own interest, to the detriment of the Plan and its participants, by allocating all forfeitures toward reducing its own outstanding and unpaid contributions owing to the Plan

## **CLASS ACTION ALLEGATIONS**

56.     ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. See 29 U.S.C. § 1132(a)(2).

57.     Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify a class action on behalf of participants and beneficiaries of the Plan. Plaintiffs seek to certify the following Class, and to be appointed as representatives ("Named Plaintiffs") of the Class:

> All participants in or beneficiaries of the MVHS, Inc. 401(k) Plan (formerly Faxton-St. Luke's Healthcare 401(k) Plan) from six years prior to the filing of the complaint in this matter through the date of judgment, except the Defendant.

58.     This action meets the requirements of Fed. R. Civ. P. 23 and is certifiable as a class action for the following reasons:

a.      The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2023, the Plan had over 4486 participants with account balances.

b.      Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

● whether Defendant is a fiduciary of the Plan;

- whether Defendant breached its fiduciary duty of prudence with respect to the Plan;

- whether Defendant breached its duty to monitor other fiduciaries and parties of interest to the Plan;

- whether Defendant engaged in ERISA prohibited transactions; and

- the extent of damage sustained by Class members and the appropriate measure of damages.

59.    Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class. Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action litigation in general.

60.    Plaintiffs have no interests that conflict with those of the Class.

61.    Defendant does not have any unique defenses against the Plaintiffs that would interfere with their representation of the Class.

62.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Breach of Fiduciary Duties*

63.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

64.     The Hospital failed to discharge its duties under 29 U.S.C. § 1104(a)(1)(A) and (B). It was obligated to discharge its duties to the Plan and its participants with the care, skill, prudence and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

65.     Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

66.     As described above, Defendant failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Pursuant to 29 U.S.C. § 1104(a)(1)(A), Defendant was required to discharge its duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." Specifically, among other failings, Defendant (i) failed to investigate the availability of lower-cost share classes of certain mutual funds; and (ii) chose its interests over the participants' interests by utilizing forfeited accounts to reduce matching contributions.  Defendant failed to have a credible basis to conclude that the Plan benefitted from its decisions.

67.     Defendant is liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total Plan losses will be determined at

trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to Plan participants to date.

68.     As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced.

## COUNT II

### *Breach of Fiduciary Duty to Monitor Excessive Fees*

69.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

70.     The Hospital was obligated to discharge its fiduciary duties solely in the interest of participants and for the exclusive purpose of defraying the reasonable expenses of administering the Plan. *See* 29 U.S.C. § 1104(a)(1)(A)(ii). In investing and managing the Plan's assets, the Hospital was permitted to incur only appropriate and reasonable costs.

71.     The Hospital failed to defray the Plan's administrative expenses as required and further failed to incur only appropriate and reasonable administrative expenses. As a result, the Plan's administrative expenses were excessive, resulting in losses to the Plan participants.

72.     Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

## COUNT III

### *Breach of ERISA's Anti-Inurement Provision*

73.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

74.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

75.    The balance in a participant's account that a participant forfeits when incurring a break in service prior to full vesting of the Defendant's contributions to the participant's account is an asset of the Plan. By electing to utilize these Plan assets as a substitute for the Defendant's own future contributions to the Plan, thereby saving Defendant millions of dollars in contribution expenses, Defendant caused assets of the Plan to inure to the benefit of the employer in violation of 29 U.S.C. 1103(c)(1). Defendant failed to employ any reasonable process or give any consideration with respect to the forfeited funds. Rather, Defendant always treated forfeited funds as being reversionary in nature and diverted all of the funds to Defendant for its own benefit.

76.    Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from Defendant's violation of ERISA's antiinurement provision as alleged in this claim and to restore to the Plan all profits secured through its use of Plan assets, and Defendant is subject to other equitable or remedial relief as appropriate.

## COUNT IV

### *ERISA Prohibited Transactions*

77.     Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.     29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . exchange . . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

79.     Defendant is a party in interest, as that term is defined under 29 U.S.C. §1002 (14), because it is a Plan fiduciary and because Defendant is the employer of Plan participants. Defendant caused the forfeited funds to be removed from the Plan trust and transferred to another account controlled by Defendant. This is a transaction for purposes of 29 U.S.C. § 1106. Defendant then used the forfeited funds (Plan assets) to satisfy Defendant's contractual obligations to the Plan and Plan participants.

80.     By electing to use forfeited funds in the Plan as a substitute for Defendant's contractual and legal obligations to the Plan, and thereby saving Defendant millions of dollars in contribution expenses, Defendant caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or a use of Plan assets by or for the benefit of a party in interest. As a result of these prohibited transactions, Defendant caused the Plan to suffer losses in the amount of the Plan assets that were substituted for future employer contributions and the lost investment returns on those assets.

81.     Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited transactions alleged in this claim, to reverse

and/or correct the prohibited transactions, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

A.    Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Find and declare that the Defendant breached its fiduciary duties and engaged in prohibited conduct and transactions as described above;

C.    Find and adjudge that Defendant is liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

D.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

E.    Order disgorgement of all assets and profits secured by Defendant as a result of each ERISA violation described above;

F.    Order Defendant to provide an accounting necessary to determine the amounts Defendant must make good the Plan under §1109(a);

G.    Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

H.    Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

I.      Order the payment of interest to the extent it is allowed by law; and

J.      Grant other equitable or remedial relief as the Court deems appropriate.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable by law.

Dated: January 23, 2025                          Respectfully submitted,

                                                 POMERANTZ LLP

                                                 */s/ Gustavo F. Bruckner*
                                                 Gustavo F. Bruckner
                                                 Samuel J. Adams
                                                 Ankita Sangwan
                                                 600 Third Avenue, 20th Floor
                                                 New York, New York 10016
                                                 Telephone: (212) 661-1100
                                                 Facsimile: (917) 463-1044
                                                 gfbruckner@pomlaw.com
                                                 sjadams@pomlaw.com
                                                 asangwan@pomlaw.com

                                                 *Attorneys for Plaintiffs*